# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| PATRICIA THERIAULT, | ) |
|         Plaintiff, | ) |
| v. | ) Docket no. 2:15-cv-530-GZS |
| GENESIS HEALTHCARE LLC, | ) |
|         Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 31). After considering the Motion and related filings, the Court GRANTS the Motion, for the reasons explained below.

**I.  LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

## II.  FACTUAL BACKGROUND

Plaintiff Patricia Theriault (also known as "Patty" or "Pat") is a Certified Nursing Assistant ("CNA") who began working at Defendant's nursing facility, RiverRidge Center ("River Ridge"), in 1997.[1] River Ridge, located in Kennebunk, Maine, is licensed by the State Department of Health

---

[1] Defendant Genesis HealthCare LLC, headquartered in Pennsylvania, is the indirect owner of the nursing facility, doing business as RiverRidge Center. The River Ridge facility became part of Genesis HealthCare in 2008.

2

and Human Services ("DHHS") to provide skilled nursing and rehabilitation services and assisted living to its residents. As a licensed nursing facility, River Ridge is required by state law to report any reports or allegations of suspected abuse immediately, without waiting until it has conducted an investigation into the reports or allegations. Cheyenne Wagner was a CNA and also a Certified Residential Medication Assistant ("CRMA") who worked at River Ridge from early 2014 to early 2015. Theriault and Wagner worked the same shift on the Saco River unit at River Ridge, with Theriault providing personal care for the residents while Wagner would dispense medications. Until the events triggering this suit, Theriault never had serious issues with her job performance.[2]

On November 11, 2014, Wagner complained to River Ridge Human Resource Manager Elizabeth Moore about Theriault. After meeting with Wagner, Moore prepared a memorandum summarizing their meeting. According to the memo, Wagner complained to Moore that Theriault, among other issues, was "prying into [Wagner's] personal life by looking at medications in [her] open handbag" and asking her why she was on medication.[3] (Joint Stipulated Record ("JSR") (ECF No. 30), Page ID # 208.) Wagner was in fact taking medications during this period and had been placed on light duty due to an injury, but River Ridge knew about her medications and had approved her taking them. As a result of Wagner's complaint to Moore, management assigned Theriault to a different unit so that she and Wagner would not have to work together.

On November 17, Theriault met with Moore to raise several issues. Moore again prepared a memo summarizing the meeting. According to Moore's memo, Theriault first asked why she

---

[2] Theriault had previously been counseled to avoid gossiping in the workplace and had received one corrective action notice regarding a dispute with a co-worker. (Joint Stipulated Record ("JSR") (ECF No. 30), Page ID # 108.)

[3] Wagner also complained that Theriault had been bothering her on Facebook.

3

had been re-assigned to a different unit and then began to complain about Wagner. The relevant section of the memo reads in its entirety as follows:

> Patty then stated that she had been having trouble with Cheyenne Wagner; that she felt Cheyenne didn't like her and that she wanted to help her. I asked her what she meant by that and Patty stated that she is "kind of like the fixer for the girls on the unit[."] When they have problems, she listens and tries to help them out. Patty said that she asked Cheyenne if there was a problem between the two of them that she would like to work it out and Patty said Cheyenne told her "there was no problem" and that she just wanted to do her job. Patty said she doesn't like to leave things unresolved and told her that if she needed to talk to her she could. Patty then stated that Cheyenne got a little miffed and said that she "just wanted to complete her med pass[."] Patty stated that she felt like Cheyenne was rude to her.
>
> I asked Patty if she spoke with her unit manager about it and she said she didn't. I explained to Patty that the most important job here is resident care [and] that sometimes people don't really want to have social conversations. I explained that perhaps private and personal matters are not something that everyone wants to discuss.
>
> Patty then stated again that, "well, I like to help people if something is wrong." I acknowledged her care and concern but again reminded Patty that if co-workers do not want to discuss personal matters, that it's their choice to make and that we should all respect that.

(JSR, Page ID # 148.) Theriault alleges that Moore's memo is incomplete and that she also told Moore that Wagner had been acting nervous, standoffish, and rude; that Wagner had expressed discontent with her job; that she used the facility phone to make personal calls and the facility computer to look for jobs; and that she had texted while doing her med pass, that is, while dispensing medications.[4]

---

[4] At her deposition, Theriault initially testified that the Moore memo was a complete and "very accurate" record of their conversation. (JSR, Page ID # 116.) However, later in her deposition, she also testified that she told Moore everything that she later put in a written statement she shared with River Ridge management on November 21. (JSR, Page ID # 129.) This discrepancy creates a genuine issue of material fact that the Court cannot resolve on summary judgment. That said, there is nothing in the record to support that Theriault told Moore anything beyond what she later put in her written statement. For example, the Court disregards Theriault's unsupported assertion that she "also reported to Moore . . . her beli[ef] that Wagner was abusing drugs," Pl.'s Statement of Material Facts (ECF No. 41) ¶ 42. See Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.").

4

Theriault subsequently asked Acting Director of Nursing Sarah-Louise Corson if she could speak with her, but Corson said that she was very busy and asked Theriault to write her concerns down. (JSR, Page ID # 118.) During this one to two minute interaction, Theriault mentioned the "Cheyenne situation" but did not discuss the substance of her concerns with Corson.[5] (JSR, Page ID # 118.) Theriault began working on a write-up of her concerns, based on notes she had been taking, that she would eventually present to River Ridge management on November 21, as described below.

On November 20, Wagner met with Moore, Corson, and River Ridge Administrator Robert Straznitskas and made several allegations against Theriault, including that she had improperly put her hands on a resident (sometimes hereinafter referred to as "Resident #1"). After this meeting, Straznitskas sent an email to Moore and Valerie Coleman, Regional Vice President of Operations for Genesis, stating, in relevant part, the following:

> Upon receiving information that c.n.a. Cheyenne Wagner was experiencing stressful relations with a coworker, [Moore, Corson, and Straznitskas] met with Cheyenne . . . .
>
> Cheyenne gave feedback regarding coworker Patty Theriault regarding these experiences:
> - Patty had "shaken" [Resident #1] from Saco unit when she was upset at him for being difficult. When asked if any other employee had witnessed this behavior Cheyenne claimed that some others might have (Megan), but for sure Rosa Vazquez had witnessed this . . . .
> - One time Patty had asked another co-worker if she "had a gun" when feeling irritated at another resident.
> - When resident [redacted] was overwhelming her, she had asked the family i[f] they had a "noose and bucket" ready for him. Family left upset.
> - Patty once asked the medicine delivery guy from the pharmacy for a baseball bat.

---

[5] Theriault's assertions in the summary judgment filings that she had a substantive conversation with Corson about Wagner on this occasion are flatly contradicted by her own deposition testimony. (See JSR, Page ID # 118.) The record is similarly clear that although she may have "mentioned" her concerns to her unit manager, Nicole Bean, Theriault did not tell Bean her specific allegations, such as that Wagner texted while doing her med pass. (JSR, Page ID # 117.)

5

(JSR, Page ID # 209.) Wagner had also repeated her previous allegations that Theriault had looked inside her purse and was bothering her on Facebook.

Following the November 20 meeting between Wagner, Moore, Straznitskas, and Corson, Moore and Corson called Theriault immediately and told her that she was suspended pending investigation, as required by Genesis policy.[6] Wagner's allegation regarding Theriault's physical interaction with a resident was reported to DHHS, as required by Genesis policy and state law. The report submitted to DHHS by Corson on November 20 stated, under "Description of Incident," "CRMA reports seeing a CNA physically shake and yell at a resident after getting frustrated with said resident." (JSR, Page ID # 218.)

The next morning, on November 21, Corson called Theriault and told her to come in to work that day to meet with administrators.[7] Corson, Straznitskas, and Donna Trundy, a regional Genesis employee, met with Theriault. Theriault gave the administrators the document she had prepared describing her allegations against Wagner and they all read it. At the time she had written the statement, Theriault did not have any knowledge of Wagner making allegations against her. Theriault's document reads in its entirety as follows:

> About 2 weeks ago, [another River Ridge employee] was going to work until 7pm on Saco and did 7 to 3 on Mousam then 3 to 7pm on Saco . . . I worked 3 to 7 on Kennebunk and to go to Saco at 7 to 11 pm . . . When I went to Saco at 7pm Cheyenne Wagner was doing her med pass I asked how the men [were] and if anything was going on that I should know about she said no not really that all the work was done [except] for meds . . . she said this very rudely and as time passed she was really acting nervously and at one point while she walked by me she turned away and stuck her nose up in the air . . . Once her med pass was done, she was in the little med room office banging around, nervously and So I went in and asked her if she needed any help or what could I do to help . . . response was I am just doing my job I am too busy . . . during the med pass there was at least one or two of the guys that came to her for one thing or another and [she] was quite rude to them Around 9:45 pm Cheyenne was putting on her coat I said to her oh you [are]

---

[6] The record is unclear as to whether Moore or Corson told Theriault the reason for her suspension.

[7] The record is unclear as to what Corson told Theriault about the meeting's purpose.

6

> going on a break . . . NO she said I just want to go outside . . . and stormed off the unit . . . when she returned 20 minutes later, her mood had changed dramatically and was talking to me normally . . . for the rest of the shift . . . I also asked Cheyenne if there was a problem between us let me know and we could discuss it and perhaps work it out but she said there wasn't . . .
>
> Cheyenne also told me that while [a River Ridge employee] was out on [maternity] leave that she was the second shift supervisor ([another River Ridge employee] filled [the River Ridge employee]'s hours with Cheyenne on a temp basis) and she was suppose[d] to supervise anyone who worked there and tell them what to do . . . boss them around to the point of when to take the laundry/trash out . . .
>
> There [are] many times that Cheyenne has been texting on her cell phone during her med pass . . . and there [were] times she made a personal phone call from the facility phone . . . for personal reasons not cause she was working extra to let family know.
>
> She has also told me in a conversation we had one night the conversation was what unit we liked the best she said Saco doing meds . . . What about the other units she said she hated Kennebunk and Mousam I asked what staff or patients she said both . . . and just wanted to stay on Saco to do meds. I reminded her that we work for the whole building and not just one unit . . .
>
> Cheyenne has also made it know[n] that she doesn't want to be at River Ridge and that she was openly looking for another job
> I have seen her use the facility computer to look for a job opening[] and filling out job applications on line . . .
>
> I only wish that I had kept a better record of [these] things dates, time who was around and with more detail . . . . . . . . . . . . . . . . .

(JSR, Page ID #s 221-22 (ellipses and formatting as in original)). The administrators each read the document, but they did not discuss it further and the meeting moved on to a discussion of Wagner's allegations against Theriault.

Later on the 21st, Corson sent an email to Moore summarizing the meeting with Theriault. It reads as follows:

> The following is an account of the interview of Patty Theriault conducted by Rob Straznitskas, Donna Trundy and Sarah-Louise Corson. When asked about any inappropriate behavior of staff on the unit initially she was hesitant to answer but then discussed that there were short tempers including Cheyenne Wagner especially with residents asking questions while she was passing meds and use of cell phones.

7

> When asked if she had ever witnessed any abuse or neglect on the unit she immediately replied "NO". She was asked how she herself dealt with frustrations and was never able to give a direct verbal answer but would frequently immediately put up both hands arms completely extended not always realizing her reaction. It was noted that every example of frustration that was spoken about was in regards to [Resident #1] [.] When asked if she had ever put her hands on him in a non-clinical manner she admitted to grabbing him from behind around neck and shoulders to prevent him from falling out of his wheelchair. She frequently spoke about how she loves what she does. When specifically asked have you ever grabbed R#1 by the shirt front she could not directly recollect any incident. When asked about making inappropriate comments such as asking people for a bat to hit residents she immediately changed her attitude behavior and did fully admit to this although stating that this was a joke and acting as though this was normal behavior. When asked about speaking to a family member about a noose and a bucket she admitted that she might have said that but wasn't entirely sure it was possible. She stated that "I didn't mean harm[."] When the question about the noose and the bucket came up she did shortly stop and start to ask about what was going to happen to her. This was followed by statements such as "I don't deny it[."] "If I had done that I'm sorry" (in reference to grabbing R#1's shirt). She also stated that "I might have done it[."] We told her that we would be in touch as soon as we had an answer for her.

(JSR, Page ID # 213.) Theriault essentially agrees that this email accurately reflects what was discussed at the meeting other than omitting the circulation of her written statement.

River Ridge management investigated Wagner's allegations. CRMA Rosa Vazquez was interviewed based on information from Wagner that she may have witnessed inappropriate behavior by Theriault. Vazquez provided the following written statement:

> I seen Pat grab [Resident #1's] t-shirt with both hands and say do not hit me and he told her to not touch him and to get away from him. I then went and assisted [Resident #1] because I could see Pat T. was getting annoyed and impatient.

(JSR, Page ID # 210.) Management interviewed Resident #1 and two other residents who may have been present during any incident with Theriault. Resident #1 is brain injured, a very large man, a high fall risk, and sometimes can be combative with River Ridge employees. Theriault, on occasion, would ask him to sit down because he was unsteady on his feet and not able to walk

8

unassisted.[8] When interviewed, Resident #1 "ha[d] no recollection of any abuse or negligence performed" (JSR, Page ID # 214), while the other interviewed residents stated that they had not witnessed any abuse or neglect. Management also interviewed two other River Ridge employees who both said that they had not directly witnessed any incidents resembling patient abuse.[9]

Straznitskas, Moore, and Corson all agreed that based on the information developed during the investigation into Wagner's allegations, Theriault's employment should be terminated because her alleged conduct met Genesis's and the legal definition of abuse.[10] It was important to them that Theriault had not denied her inappropriate statements and laying hands on Resident #1, even if she claimed that any statements she made had been jokes and any physical contact with Resident #1 would have been to prevent him from falling.

On November 24, Moore sent an email to Regional Vice President of Human Resources Pat Colanton and Straznitskas that reads as follows:

---

[8] Techniques of proper fall prevention and their potential application to this case are disputed by the parties, as is the relevance and application of techniques for dealing with combative residents.

[9] It is possible that there was more than one alleged incident of improper physical contact between Theriault and Resident #1. For example, in her deposition, Wagner testified as follows:
> Q: So the incident that you discussed in this meeting [with Moore, Corson, and Straznitskas] was an incident that you witnessed?
> A: Yes, and I also had told them to please discuss with Rosa because of what she had said to me and I believe that's how Rosa got involved in all that.
> Q: So the incident that Rosa witnessed was a separate incident?
> A: Yes.

(JSR, Page ID # 164.) This may in part explain the seeming discrepancy between Wagner's report that Theriault had "shaken" a resident and Vazquez's written statement that she had seen Theriault "grab" a resident. (Compare JSR, Page ID #s 184 & 231 with Page ID # 210.) The Court notes that Robert Straznitskas's email summarizing the meeting with Wagner states: "Patty had 'shaken' [Resident #1] from Saco unit . . . . When asked if any other employee had witnessed this behavior Cheyenne claimed that some others might have . . . but for sure Rosa Vazquez had witnessed this." (JSR, Page ID # 209.) It is reasonable to conclude that "this behavior" did not refer to the specific incident Wagner witnessed but rather to Theriault's alleged tendency to act in this manner. However, it is clear from the record that the River Ridge administrators based the decision to terminate Theriault in part on their understanding that she had physically interacted in a non-clinical manner with Resident #1 on one occasion. (See JSR, Page ID #s 186 & 215.) Vazquez testified at her deposition that she did indeed witness Theriault shake Resident #1 (JSR, Page ID # 264), but it is unclear from the record whether she used the word "shake," in addition to "grab," during the investigation.

[10] Theriault disputes that she committed abuse because she claims that she never put her hands on the resident in a non-clinical manner. However, she does not appear to contest that her behavior as alleged would constitute abuse.

9

> On Thursday, November 20, 2014, Patty Theriault, C.N.A., was placed on unpaid suspension pending investigation of resident abuse and gross misconduct by an employee.
>
> The supporting documentation attached contains the incident report to the state, interviews and statements from staff members on the unit as well as the interview with Patty. The final statement is from Patty.
>
> During the investigation, it was confirmed that:
> 1. Patty grab[bed] a resident's shirt with two hands in a non-clinical manner[;]
> 2. Patty had "jokingly" asked the LPN on a med cart for a gun to handle a resident[;]
> 3. Patty was having a difficult time with a resident and asked the gentleman who delivers meds to the unit if he had a baseball bat she could use[;]
> And 4. That Patty told a family member that she had a noose and a bucket for a client; which was their family member.
>
> In addition, Cheyenne Wagner, a CRMA and co-worker with Patty on Saco River Unit, stated that she caught Patty going through Cheyenne's purse and questioned Cheyenne about a prescription she found.
>
> It was reported by other employees that there have been some issues outside of the facility regarding Patty, Cheyenne and social media use.
>
> Based on this investigation and interview with Patty and staff[,] I am asking for approval for termination of Ms. Theriault.

(JSR, Page ID # 215.) Also on November 24, Corson sent a required follow-up report to DHHS again recounting the allegations as "CRMA reports seeing a CNA physically shake and yell at a resident after getting frustrated with said resident." (JSR, Page ID # 226.) Corson also attached an Internal Investigation Summary, which included the statement that "Rosa witnessed Patty Theriault putting her hands on resident" and a handwritten "x" next to the pre-printed statement "[a]llegation of misconduct substantiated." (JSR, Page ID #s 229-30.)

10

Colanton approved Theriault's termination and she was fired on November 25.[11]  Corson subsequently investigated the allegation that Wagner was texting during her med pass, but concluded that the claim was untrue based on speaking to Wagner and other employees and being present on the unit.[12]  (JSR, Page ID # 241.)

## III. DISCUSSION

Theriault claims that Defendant (1) fired her in retaliation for her reports regarding Wagner, in violation of the Maine Whistleblowers' Protection Act ("MWPA"), and (2) defamed her in its reports to DHHS and in "intercorporate communications." (Compl. (ECF No. 1) ¶¶ 17-23, 27.)  Defendant has moved for summary judgment as to both claims.

1. Theriault's MWPA Claim

The MWPA provides, "No employer may discharge . . . an employee . . . because . . . [t]he employee, acting in good faith . . . reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. § 833(1)(B).  The elements of a prima facie MWPA claim are

> (1) that the employee engaged in activity protected by the [M]WPA [*i.e.*, makes a qualifying report about a dangerous condition or practice]; (2) that the employer imposed adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action.

---

[11] The Court notes that there is some discrepancy in the numbering between Plaintiff's Statement of Material Facts (ECF No. 41) and Defendant's Reply to Plaintiff's Statement of Material Facts (ECF No. 45), but the Court has been able to match the relevant statements of fact and responses.

[12] Defendant has requested that the Court strike Plaintiff's statements of fact regarding the subsequent DHHS investigation of the abuse allegations against Theriault asserting relevancy and hearsay objections. (Def.'s Reply to Pl.'s Statement of Material Facts, Page ID #s 433-34.)  Upon review of Plaintiff's citations in support of these objected-to statements, the Court concludes that the citations do not adequately support Plaintiff's asserted facts regarding the post-termination investigation process or its results.

Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 948 (Me. 2015).[13]

An employee's report "is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists." Id. at 949. The condition or practice can be the actions of a co-worker. See, e.g., Daigle v. Stulc, 794 F. Supp. 2d 194, 238 (D. Me. 2011) (explaining that reporting a co-worker's conduct may constitute protected activity). "Good faith" means that the employee was motivated to make the report "at least in part" by a desire to stop the dangerous condition. Currie v. Indus. Sec., Inc., 915 A.2d 400, 407 (Me. 2007). The "causal connection" inquiry includes consideration of whether an employer's purported non-retaliatory reason for its employment action is pretextual. Brady v. Cumberland Cty., 126 A.3d 1145, 1156 (Me. 2015) ("Because of the way a [M]WPA claim is defined under Maine law, in a summary judgment motion—just as at trial—the employee must not only produce evidence that she engaged in protected activity and later suffered an adverse employment action, but in the first instance she must also produce some evidence of the employer's unlawful motivation.").[14] Defendant concedes that Theriault was subject to an adverse

---

[13] "Although the MWPA provides no private right of action, plaintiffs may file a civil action [regarding whistleblowing] under the [Maine Human Rights Act]." Osher v. Univ. of Me. Sys., 703 F. Supp. 2d 51, 64 n.13 (D. Me. 2010).

[14] In Brady v. Cumberland County, the Maine Supreme Judicial Court held that the familiar McDonnell Douglas burden-shifting framework for employment discrimination actions is inapplicable to MWPA claims on summary judgment. 126 A.3d 1145, 1157 (Me. 2015). The Court, therefore, does not apply the McDonnell Douglas burden-shifting framework in light of Brady and the general proposition that, on summary judgment, "a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). Theriault's argument that a plaintiff need only show close temporal proximity of the protected activity and her termination to defeat summary judgment is misguided. (See Pl.'s Mem. Of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Response") (ECF No. 37), Page ID #s 362-63 & 366.) Brady clearly states that "the question of whether the record on summary judgment contains evidence of causation requires the court to recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that that proffered reason is merely a pretext." 126 A.3d at 1157-58.

employment action—she was fired—but contests that she engaged in protected activity or that there was a causal connection between any protected activity and her termination.

Considering the evidence in the light most favorable to Theriault, a reasonable jury could conclude that Theriault engaged in protected activity when she reported that Wagner had been texting during her med pass.[15] Theriault has alleged that she reported the texting to Moore on November 17, before Wagner made her abuse allegations against Theriault, and again on November 21, when Theriault presented her written statement to Corson, Straznitskas, and Trundy. Moore confirmed at her deposition that texting during a med pass is "potentially very unsafe" (JSR, Page ID # 188), presumably because distraction increases the risk that meds will not be properly dispensed. And, in fact, River Ridge management investigated the texting allegation against Wagner after Theriault was fired. Further, Theriault has testified that she made her allegations against Wagner because she was concerned about the safety of the residents (JSR, Page ID # 122), which supports her "good faith" in making the texting allegation.

However, Theriault's claim fails when it comes to causation. Although there is close temporal proximity between Theriault's reports and her termination, more is needed to take the case to trial. The First Circuit has explained that "[u]nder Maine law, close temporal proximity between the protected activity and the adverse action is a sufficient showing of causation for the purpose of establishing a plaintiff's prima facie case," but, to survive summary judgment, the plaintiff must produce sufficient evidence that "her protected whistleblowing activity [was] a but-for cause of the employer's decision to terminate the employment." Murray v. Kindred Nursing Ctrs. W. LLC, 789 F.3d 20, 25-26 (1st Cir. 2015) (quotation marks omitted). In other words,

---

[15] The Court can discern nothing in Theriault's other allegations that would alert a reasonable person to a safety concern and, in particular, nothing that would lead a reasonable person to understand that Theriault suspected Wagner of drug abuse or drug diversion. See supra at 4 n.4.

Theriault must produce sufficient evidence to raise a trialworthy issue that the reasons given by Defendant for her termination were merely pretextual and that she was actually fired for reporting Wagner's texting.

Generally, pretext in an employment discrimination action can be discerned, among other ways, from "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation of its employment action or from "comments . . . made by the key decisionmaker or those in a position to influence the decisionmaker." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55-56 (1st Cir. 2000) (quotation marks omitted). In this case, there is simply no evidence of pretext. Defendant consistently stated that it terminated Theriault based on her non-clinical, physical interaction with a resident and her "jokes" about harming residents.[16] Defendant undertook a reasonable investigation of the allegations against Theriault, which uncovered strong evidence of their truth. Theriault herself admitted, or did not deny, the "jokes" and a neutral witness, Vazquez, confirmed the physical incident. There are no comments in the record that would reasonably cast doubt on the motives of the administrators who made the termination decision. Nor is there any evidence of malice on the part of the administrators towards Theriault, which Theriault admitted at her deposition. (See JSR, Page ID # 131.)

It is the true that the River Ridge investigation of Wagner's allegations uncovered some evidence that cuts in Theriault's favor. For example, none the residents who were interviewed reported witnessing any improper physical incident resembling abuse. But whether Theriault actually interacted with Resident #1 as alleged "is beside the point: evidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit

---

[16] The Court notes that the reports to DHHS presumably do not mention Theriault's "jokes" because, although River Ridge management believed them to be improper, the "jokes" were not reportable incidents.

the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith." Murray, 789 F.3d at 27. Further, the Court discerns no trialworthy issue of pretext based on the fact that Theriault was terminated while Wagner was not disciplined based on the texting allegation. Although pretext can be "inferred from proof that similarly situated employees" were treated differently, id., Theriault and Wagner were not similarly situated. Wagner's allegations against Theriault were corroborated by Theriault's own admissions and the statement of a neutral third party, while Theriault's allegations against Wagner were not corroborated and were determined to be untrue after investigation. The Court therefore concludes that no reasonable factfinder would determine that Theriault's termination was pretextual.[17]

For these reasons, the Court GRANTS Defendant's Motion as to Theriault's MWPA claim.

2. Theriault's Defamation Claim

The elements of a defamation claim under Maine law are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Lester v. Powers, 596 A.2d 65, 69 (Me. 1991).

As a preliminary matter, the Court determines that Theriault's defamation claim is based solely on Defendant's two reports to DHHS. In her Complaint and response brief, Theriault mentions defamatory "intercorporate communications" (Compl., ¶ 27), and "local management

---

[17] Theriault contends there is evidence that Defendant's rationale for her termination has shifted over time. (Pl.'s Response, Page ID # 365.) But it is clear from looking at the complete document cited by Theriault, rather than just the single sentence she takes out of context, that Defendant continued to maintain that it terminated Theriault based on both her physical and verbal conduct. (See River Ridge Response to Maine Human Rights Commission (ECF No. 36-2), Page ID # 341.)

emails to Colanton" (Pl.'s Mem. Of Law in Opp'n to Def.'s Mot. for Summ. J. (ECF No. 37), Page ID # 366 n.11). However, at her deposition, Theriault made clear that her defamation claim is based solely on the reports to DHHS. (See JSR, Page ID #s 129-30.) She has nowhere identified other potentially defamatory statements with the requisite specificity to support a defamation claim under Maine law. See Picard v. Brennan, 307 A.2d 833, 834-35 (Me. 1973) ("Having in mind that . . . the defendant is . . . entitled to know precisely what statement is attributed to him, we have always required that the words must be proved strictly as alleged." (quotation marks omitted)); see also Smith v. Heritage Salmon, Inc., 180 F. Supp. 2d 208, 221 (D. Me. 2002) (stating that a plaintiff's assertion "is not adequate to state a prima facie case of defamation, because it does not allege any particular statement" and citing Picard).[18]

As already described, the two reports to DHHS both state, "CRMA reports seeing a CNA physically shake and yell at a resident after getting frustrated with said resident." (JSR, Page ID #s 218 & 226.) The Internal Investigation Summary attached to the second report states that "Rosa witnessed Patty Theriault putting her hands on resident" and includes a handwritten "x" next to "[a]llegation of misconduct substantiated." (JSR, Page ID #s 229 & 230.)

The Court concludes that the reports to DHHS, with the enclosed Summary, are subject to, at the very least, a conditional privilege because they were legally mandated reports to a governmental agency about an issue of public concern. See 22 M.R.S.A. § 3477 (mandating reporting of abuse to DHHS); see also 22 M.R.S.A. § 3479-A(1) ("A person participating in good faith in reporting under this subchapter . . . is immune from any civil liability that might otherwise

---

[18] Theriault vaguely suggests that certain internal emails describing meetings at which the allegations against Theriault were discussed are defamatory, presumably because they record the allegedly defamatory allegations. (See Pl.'s Response to Def.'s Statement of Material Facts (ECF No. 39), Page ID # 397.) However, Theriault has failed to adequately develop this argument and the argument is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

result from these actions . . . ."); Morgan v. Kooistra, 941 A.2d 447, 455 (Me. 2008) (describing the elements of the conditional privilege, including that "the statement is made through 'normal channels' to further an important public interest [and] the third party's knowledge of the information will serve the lawful protection of that interest").

The protection of the conditional privilege is forfeited if the statement's originator made it "with malicious intent," meaning that the originator "knows [the] statement to be false, recklessly disregards its truth or falsity, or acts with spite or ill will." Cole v. Chandler, 752 A.2d 1189, 1194 (Me. 2000) (quotation marks omitted). However, the Court concludes that, on the summary judgment record, the statements in the reports to DHHS are not statements indicating a reckless disregard for truth or falsity. Rather, to the extent that these statements diverge from the undisputed facts, the divergences are immaterial. See, e.g., McCullough v. Visiting Nurse Serv. of S. Me., Inc., 691 A.2d 1201, 1204 (Me. 1997) ("The statement that [plaintiff] was terminated for 'several incidents' when, in fact, she was only terminated for two incidents, is substantially true even though it may not be technically accurate. To a reasonable person, the statement that [plaintiff] was discharged because of several incidents is no more damaging to her reputation than an accurate statement would have been, namely, that she had been discharged because of two incidents.") No reasonable factfinder could conclude that Defendant abused any conditional privilege and is thus liable for defamation.

For these reasons, the Court GRANTS Defendant's Motion as to Theriault's defamation claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

SO ORDERED.

/s/ George Z. Singal<br>United States District Judge

Dated this 19th day of April, 2017.